Yes, it's still morning. Vagvala v. Tupperware Brands Corporation. Patricia Stitzel et al. 22-10658. Mr. Goldberg, you have reserved three minutes for rebuttal. You may proceed when you are ready. Thank you. Good morning, Chief Goldberg. On behalf of Plaintiff Appellate Vagvala, the District Court erred refusing to impute to Tupperware the scienter of Mr. Hernandez and Mr. Garcia-Raguel for both 10b-5a and c liability, that's scheme liability, and for 10b-5b, misstatement liability. The two previous complaints had pleaded with requisite particularity that at least Mr. Hernandez, whose scienter defendants do not contest, was responsible for and furnished information to Tupperware that caused Tupperware to misstate. Isn't that treating Mazzaro a little bit like a statutory interpretation question, looking to the plain meaning of the case and then going from there? Judge Grant, I think it is, and it is because the words that this Court uses, and in Mazzaro this Court said in theory, so it was dictum. The words this Court uses should inform, and at least in the first instance, the Court should look to the plain dictionary definition of responsible for, the dictionary definition of furnished. But, Judge Grant, you and Judge Branch, and I think it was you, Judge Grant, who wrote the opinion in the BitConnect case, dealt with the definition of the word solicit, and the defendants in the case tried, and the district court actually limited it to a personal solicitation, and this court said, that's not correct. That's a cramped definition, and we should not let definitions prevent the act from, or prevent our finding violations of the act. But, again, that was interpreting the statutory text. Sure. So, other than the plain dictionary definition of the word, Judge Grant, we're left with trying to figure out how the court should deal with responsible for, deal with furnished. The question is here, what does the admission of the company do? There is only one cogent inference with respect to the company's admission that misconduct on the part of Fuller Management, including overriding internal controls, resulted in false statements. There's only one cogent inference, and that's that Mr. Hernandez, who was terminated as a result of this, which we had alleged before the company admitted it, that he was, that his actions, that his conduct, that his knowing conduct caused false statements. And so other than either looking to this court's other cases, in, for example, the Find What case, to determine how, and also the Supreme Court's case in Stonebridge, to determine how a particular person's actions are proximate to a misstatement or, by the way, proximate to a scheme, the only way we can do that is either by reference to a dictionary definition, which is what we suggest the court should do, or by reference to analogous precedent. And we think Find What is. But let me ask. I mean, I don't want to get involved in trying to give dictionary definitions of the Eleventh Circuit opinion. I'm not sure the Eleventh Circuit judges are going to do that, and I'm certainly not. But I do want to look at the holdings of the case, how the Home Depot case came out and how the Stonebridge case came out. And it seems to me very clear from those decisions that merely engaging in a fraudulent transaction that ultimately will be reflected on the books, as they all are, is not enough. And so the point of responsible for the statements is it has to be somebody that's not just engaging in fraud but that is doing it for the purpose of screwing up the financial statements. Sure. And let me, Judge Eagle, let me direct you to the Mohawk case because it's important. The defendants rely principally on this Pugh case, Pugh v. Tribune. So let's distinguish this case, our case, from Pugh. In Pugh, a publisher of one of Tribune's publications called Oye faked circulation numbers, and by faking circulation numbers, he transmitted that to a non-party, a third party, and that party helped set advertising rates, which ultimately inured to the benefit of Tribune. In Pugh, Judge Eagle, the Seventh Circuit said, no, that's too remote. And Stone Ridge, Judge Hinkle, was a complete non-party having nothing to do with the financial statements. In this case, however... But all of those, the defense won. I mean, you're giving me all cases, the defense won. You need to be telling me about the cases. The plaintiff won. Yes. So I refer you to Mohawk. The difference between Mohawk and Pugh, Judge Hinkle, is that in Mohawk, the parent company, the company, was touting the flooring division that was committing this fraud and committing fraud by shipping out lots of product on Saturday. I call it the Saturday fraud, before the end of a quarter, knowing that there would be no one there to receive it. It was all fraudulent, just as the revenue here, the fake sales here, were. And the reason why the Mohawk plaintiffs won the motion to dismiss Judge Hinkle is because the company itself had discussed with the market that very division. So here, let's put it in context. The district court erred below by not dealing with the context here. There was an impairment, the stock price fell, the company warned that if there was a future impairment, that the stock price would fall again. The company hired Mr. Hernandez and elevated Mr. Garcia-Rangel precisely to fix this division. Throughout the class period, Judge Hinkle, the company said, Fuller's doing better, Fuller's doing much better. Fuller's had three-quarters of success, such that, Judge Hinkle, we don't think that there is substantial risk of further impairment. Therefore— But the problem is, do the people that are making those statements know that they are untrue? That's what you have in trouble with. No, actually, Judge Hinkle, let me separate this. We are not alleging that the makers, Ms. Stitzel, for example, are primary violators. We don't have to. The point of Mazzaro is— and I'm not quite sure why the panel writing that decision put somebody in quotations. I think what they meant is you have to specify who the person is who is responsible for the misstatement, right? We're not alleging primary liability. And, Judge Hinkle, we're not alleging primary liability against Mr. Hernandez. We are alleging primary liability against Mr. Garcia-Rangel for scheme liability, not for making statements. Under your proximate cause argument that I think you're making, is there any situation in which an employee's scienter wouldn't be credited to the corporation? Yeah. I'll refer you to the MACOR rights case in the Seventh Circuit. In that case, Judge Posner wrote about an embezzler, right? So certainly, just as in the Pew case, someone's doing something different to goose some numbers, which didn't necessarily inure to—forgive me, to goosing some numbers. Effectively, in MACOR rights, what Judge Posner says is if someone's embezzling, that doesn't inure to the corporation's benefit. So that's another test for— Right, but what if someone just really believes in their company? And they're 10 layers down, but they want to take actions that inure to the corporation's benefit. Maybe they have a few shares of stock, and they want it to do well. So they submit a falsehood internally, and it goes up 10 levels before it actually gets submitted in this report. Does the corporation have liability there? Probably not, but that hypothetical is difficult. And here's why, Judge Grant. If the person is actually acting for the corporation, to benefit the corporation, that's where Judge Posner drew the line. The embezzlement is for the person who ultimately gets the money. But if you're working for the corporation, yes, it's a little bit like a chef poisoning an ingredient before it goes into a dish, before a facilitator sends it to a waiter who furnishes it to a patron. The person who put the poison in the food is a proximate cause of the patrons getting sick. In a tort law, in a lot of cases, you would have to show that, say, the restaurant wasn't taking appropriate precautions, or they ignored the risk that they had hired a psychotic poisoner or something else. It's not a strict liability generally in a tort law for if you have an employee who does something bad, your corporation is responsible. It sounds like you're making, like you're saying that a different standard should apply in this context. No, no, no, no. Not particularly. But what I am saying is this case is different. There are different cases. As the Supreme Court wrote in the Lorenzo case with respect to separating A and B and C, effectively you can distinguish between the mailroom clerk and the vice president of an investment bank giving out information to potential clients. The mailroom clerk absolutely furnishes, but that's too rigid, in your words, Judge Grant, too cramped a definition of furnish because the mailroom clerk, if she knew that there was false information in what she was providing, simply by her handing the information in, she could be a furnisher. But that's why a more flexible standard is important. Courts can make these decisions. This case, however, isn't a hard one. This isn't someone very low. This is the senior executives of Tupperware hiring an executive, elevating another executive at the corporate level, and saying to those two, you have to resurrect this. You have to revive Fuller. And once you revive Fuller, we're not going to have to impair, and the stock price might fall. And so you have mentioned something a little bit ago. You talked about the scheme liability. So as I read the complaint, you have been proceeding under a misrepresentation nondisclosure claim. Where is your scheme liability claim, which is focused on conduct? Your Honor, actually, that's a very interesting point. The district court, we had said the defendants had waived the scheme liability argument in our opposition to the first motion to dismiss, and the district court said they haven't. They did waive it. They didn't raise it. The entire complaint is about a scheme. There's no payment.  and you even in the initial paragraph of the complaint talk about this is misrepresentation nondisclosure. Well, we actually talked about the scheme. Let me just tell you. Can you point to the paragraphs? I sure can. Count one, Judge, is all, is A, B, and C. But let me just say this, Judge. Mr. Garcia-Rangel is not a maker of any statement. He cannot be primarily liable for being liable. Tupperware is liable for B liability because it actually makes statements through its officers and directors. May I continue? Yes, please. But Mr. Garcia-Rangel made no statement. We do not allege he made a statement. He's not a maker under Janus, which means that that, coupled with a myriad of representations in the complaint to references to the scheme and the A and C liability in the count means that we're absolutely seeking a relief under scheme liability. If I could address scheme liability for a minute, Judge Branch, Lorenzo's clear that these can overlap. A pure misstatement case is we've hired a sales force to pitch this drug. Everything's going well with that sales force and we don't anticipate changing anything when earlier that morning you had fired that entire sales force. That's a pure misrepresentation, no scheme. As the Supreme Court wrote in Lorenzo, there can be troubling cases, there can be close cases, but that doesn't mean that you can't have both scheme liability and B misstatement liability. So this complaint pleads both and it's clear on its face by virtue of having it in the count and by having a primary defendant who is not a maker. But Judge Branch, in this case, we are different from an L-10. We are at an L-1. They elevated Mr. Garcia Rangel to his then current position of group president of Latin America and a named officer in this company and they hired Mr. Hernandez to run Fuller. That's not L-10. So even if, Judge Grant, an L-10 isn't someone whose Sientra court should impute to the company, an L-1 is and an L-2 is because these are the persons, they created the scheme, well, Mr. Hernandez created the scheme, he was fired over the scheme and therefore he is responsible for, one, false Fuller numbers and two, Tupperware's not impairing more quickly the remaining intangibles and the commensurate fall in the stock price. But the number 10 that Judge Grant asked you about is a cause in fact of the false financial statement. I understand one place to draw the line, which is anybody who is, in my language, responsible for the false statements, somebody who has something to do with putting out the financials. So you could cut it off there and if you cut it off there, you lose. Or you can say somewhere between level 1 and level 10, somebody that's not involved with the statements but is involved with the fraud and you're test for deciding how far to go down from 1 to 10 and don't tell me the facts of this case, tell me the rule. What is the rule that distinguishes, that tells you where to draw the line between number 1 and number 10? I would suggest to you, Judge Hinkle, I don't have one. I would suggest to you, Judge Hinkle, that the Supreme Court wouldn't make one based on its comments in Lorenzo. There are difficult cases, but in Lorenzo, for example, I have to instruct a jury. So it doesn't do to say, jury, look at the individual case. I've got to give the jury a standard. You tell me what that jury instruction says. It's substantially similar on a substantive basis to a proximate cause instruction in any tort case and, in fact, in a 10 v. 5 case. Got it. I can give a proximate cause instruction. So, for example, what we say here, Judge Hinkle, is the full reps, the actual salespeople in Mexico, they have, in the district court's words, some involvement in this fraud. They clearly do. We know they knew about it. We don't try to impute their scienter. The coordinators, we don't try to impute their scienter. We know they had it. The complaint pleads it. The division, most of the former employees we cite to are division heads. You've answered my question. Okay. And you have exceeded your time, but you have reserved three minutes for rebuttal. Mr. Duquiet. And please correct me if I messed that up. Your Honor, it's Duquiet. Okay. Like Chevrolet. And I may please the court. Thank you, Your Honors. Jim Duquiet on behalf of the defendants. As your Honor, I say this is not a typical securities fraud case. This is a situation where, as my friend says, none of the makers of the statements at issue here are actually knowing about what's going on at Fuller. And instead, what's happening here is the plaintiff is trying to sort of take the scienter of the lower-level folks down at Fuller and combine them with the statements made by the makers and say that because they all ultimately report up to the same parent that that is securities fraud. And in Mazzaro, this circuit held that in those kinds of situations where you're trying to sort of ascribe a scienter to an entity, there needs to be some sort of direct and meaningful connection, some relationship. There needs to be some level of responsibility on the part of the non-speaker whose scienter is imputed to the corporation. It's not enough to just sort of put inaccurate information into the stream of data that makes its way up to the corporate entity for purposes of public reporting. And why does that make sense? Why is that appropriate as a policy matter under the federal securities laws? And I'll offer up a few potential reasons. Number one, this is a private securities fraud class action. It's a private right of action under 10b and 10b-5. And the Supreme Court has made very clear that Rule 10b-5 is not a form of investor insurance. It doesn't sort of insulate against any and all investment losses that may be suffered. And related to that, it's not a strict liability standard. It's a fraud statute, and it requires intentional fraud or scienter. There are provisions in the securities laws, of course, that do provide for a form of strict liability. That's Section 11 of the 33 Act, for example. But that's not true for a 10b-5 case. And the Supreme Court's never addressed this precise question, what is the appropriate legal standard when you're trying to impute scienter up to the entity. But they have resisted an expansion of the private right of action. So in Stone Ridge, for example, they said aiding and abetting liability, that's not a cause of action under 10b for private litigants. In the Janus case, the court said you need to be a maker of a statement. It's not enough that you had some role or participation in order to be primarily liable. And then most importantly to this case, Congress, when it passed the Private Securities Litigation Reform Act, was especially focused on this question of scienter. Because what Congress thought was that it was too easy under existing law to allege a fraudulent state of mind. Remember under Rule 9, all you have to do is aver generally, right, that someone acted with a particular state of mind. And Congress said that is inappropriate because it allows too many cases to survive past a motion to dismiss. And so it imposed this very rigorous pleading burden of a strong inference of scienter. You have to allege facts that give rise to a strong inference of scienter. And here, you know, my friend has not identified another circuit-level decision that has upheld a claim on this set of facts. You really would be expanding the scope of a private right of action under 10b. And as I said, there's really no good policy justification for that, and it's not consistent with Mazzaro either. And by the way, just to be clear, that's not a free pass to wrongdoing, as my friend has suggested. There are a lot of remedies that are still available other than a private right of action under 10b.5. And just take a look at what happened in this case, for example. People were fired. There was an SEC investigation. There is currently a derivative lawsuit out there in which shareholders are seeking to step into the shoes of the company and bring claims against the alleged wrongdoer. So this is not sort of a free pass. And Judge Presnell, after giving the plaintiffs three opportunities to state a claim, I think quite correctly held that there had been no strong inference of scienter that was created by virtue of the allegations here. Is this a scheme liability case? It's not, Your Honor. It is really... Tell me why. Well, because the issue here, the alleged wrongdoing, centrally relates to the public statements that were made by the company. That's what these investors say they relied upon. Okay? So you're pointing to his amended complaint... Yes. ...and saying that's not the case you brought. That's right, Your Honor. Yes, the third amended complaint I think makes very clear. This is a case about statements and statements that were made by Tupperware. The financial statements they alleged were false and misleading. And so no investor is relying on sort of a scheme, and that's what I think differentiates this from some of the other cases that my friend cited. It's not a broker-dealer case where there's some sort of pattern of activity that the investor is relying upon. It's fundamentally a case about disclosures. And because it's a case about disclosures and because of the limitations of 10b-5, you do need to identify someone with a culpable state of mind who had some responsibility. I guess our question, I think that's right under our precedent, but our precedent hasn't been as specific as some other circuits in terms of who can be responsible. And so I know in the Sixth Circuit, I think the court said two categories. One, the individual agent who uttered or issued the misrepresentation. I think we all agree on that. And the second category was any individual agent who authorized, requested, commanded, furnished information for, prepared, which includes suggesting or contributing language for inclusion therein or omission therefrom, reviewed or approved the statement in which the misrepresentation was made before its utterance or issuance. What do you think about that standard? Well, Your Honor, I think if, first of all, it applied to this case, you should still affirm because I don't think Mr. Hernandez or anybody else needs that standard. And I'm happy to explain why. But I think everything you just articulated and that the Sixth Circuit articulated in the Amicare decision is centrally related to some kind of relationship  And that's what's missing here because, again, what you have is, if you go back to Mazzaro, for example. So I know you don't think that this claim would survive under that standard, but since we have to set a standard that will help district courts in the future, what do you think of that standard and would you change it? Your Honor, I actually think the Mazzaro standard would apply well here. I mean, I think it does too, but I don't think it really gives us the information that we need because we're still wondering who counts as responsible. She's trying, God bless her, to tell the district courts what the jury instruction should say. And I want to be useful in that endeavor. I think the formulation that the Sixth Circuit used would be fine, again, because it ties back to this underlying concept of responsibility. And that's really what the court in Mazzaro was talking about. And, again, think about the Home Depot fraud there, right? The issue in Home Depot was a scheme by which the financial statements were misstated because of these vendor rebate issues, right? And the allegation in that complaint was this was widely known. Everybody knew about it. And they cite information from former employees down the chain. We were well aware of this. It doesn't state a claim because you have not identified any natural person who both made a statement that was false completely and who had that level of responsibility or the like. And the only tweak I would make, Judge Grant, to the standard is I think it's important that when you talk about concepts like furnishing, it needs to be furnishing in relation to something. So in Mazzaro itself, and this is language that they took from the Southland decision in the Fifth Circuit, it's not just furnishing, right? It's furnishing for inclusion therein. In other words, there needs to be some level of understanding, awareness, and the like that the information that's supposedly false is designed for public consumption. Does it need to be explicit that that's the reason? Let me give you an example. So I have to do a brief. I'm going to submit a brief to this court. And I turn to my colleague and I say, could you draft up a paragraph for me on the standard group review? And I get it. I put it into the brief and I submit the brief. That's furnishing information for purposes of inclusion. Another example would be I've got a section in the brief and I need a case site that really supports this proposition. And I ask my colleague, could you go find a case work? I put it in. Furnishing data for inclusion. What is not furnishing under this test? Let's say the other section of the brief deals with some issue of Georgia law. And so I go into our firm's files and I dig up a 50-state survey that some poor summer associate wrote a couple years ago. And I take that section and I use it for purposes of the brief. That's not furnishing in the sense in which Mazzaro or any of these other cases are talking about, because that's just sort of completely ancillary and unrelated to the public statement. So what if the executive receives monthly reports from whoever, all the people one level below him or her? And it's known that the executive will use those statements in creating these filings. Would that count as, if you provided that state, that monthly report, would that count as furnishing? It also includes that last part of your hypothetical, which is it's known that this is going to get sort of, yeah, part of what gets disclosed to the public. And my friend mentioned the Mohawk decision. That's actually a nice example of what we're talking about here, because the key point in Mohawk was you had someone who was preparing reports and then was preparing a written certification, right, to the effect that these reports are accurate with knowledge that it's going to get disclosed to the investing public. And that's the link that's just missing here. We just don't have anyone who is directly responsible or has any sort of direct input or involvement into the public statements. And again, these are statements about the financial condition of the overall company. Does Rangel, would you concede that Rangel as group president for Latin America does have, is responsible for financial statements? I would not, Your Honor. Isn't he as group president for Latin America providing reports up the chain that are going to make their way into the disclosures? It struck me that he seems to be at that level. The problem in this case, I think you would argue and the district court would agree, is that the allegations against Rangel showing his scienter were not sufficient. Yes. I agree with that, Your Honor. But would you also then concede that had it been shown that he was aware of the fraud, knew about the fraud, said thumbs up to the fraud, that he in fact would be responsible for those statements? He might be. I think what would be important is that last element, which is that he had a direct understanding that the reports that he's providing up the chain to corporate are going to get put into the public statement. Doesn't it have to be at least something more than just providing information that's going to be incorporated? Frankly, the cashier, at least if the cashier has gone to college and taken the first accounting class, knows that when the cashier rings up the cup of coffee, that that sale is going to be included in the financial statements. I completely agree, Judge Hinkle. And then it gets back to materiality and all of that. Agreed, agreed. And I guess, you know, to the question about Garcia-Rangel, I mean, again, if this were a case like Mohawk, if there were an allegation, and there isn't, that Garcia-Rangel certified, you know, filed a Sarbanes-Oxley certification or something like that, I think that would provide the direct relationship that I think, Judge Hinkle, you're getting at. Because every financial transaction in the company makes its way up. But surely you would concede that the group president for Latin America is more likely than not not signing off on Sarbanes-Oxley filings. Well, it's not in the record that he did so. But I think the test that we've been discussing doesn't require that. It would be, as you yourself have indicated, if we've got group leaders or division leaders that are sending financials to the company that will be signing these disclosures, that that person who's sending the reports in would be responsible for. And again, I would go back to the standard here, which is a strong inference, right? And so, you know, I think what a plaintiff in that circumstance would have to allege is a set of facts that taken in totality would support a strong inference that the group president, in fact, is the one who's formally signing off on the accounting materials that are going to then be presented to the investing public. And that's not what this complaint alleges. I did have one technical question that's really kind of below the surface, but it plays into this discussion we've been having. Garcia, Vargas says that FE4, who's I guess a divisional director, says that Garcia said that the fake sales scheme was unsustainable. So this is a statement by Garcia clearly indicating knowledge of the fraud. In the district court, you say, well, that's not admissible, and I'm trying to figure out why that doesn't come in under. Now, I understand what Vargas said. I mean, assume for a minute that Vargas, assume for a minute that FE4 actually testified. So I know what Vargas says, FE4 said, that's hearsay. I got it. But if FE4 testifies to what Garcia said, then that's 801D2D. That's the statement of the party opponent, right? I agree with that, Your Honor. And I think so, therefore, it's important to go back and look at actually what was alleged. And, you know, before I do that, just very briefly, let me say, Judge Preznell gave them three bites at the apple, and they had access to the former employees, including FE4. And so when Judge Preznell, in dismissing the second amended complaint, said, I need more context, you need to tell me more about what's going on here, presumably they went back and talked to FE4. But what they ascribed to FE4 isn't that he said it was unsustainable, it's that he thought it was unsustainable. And then if you look at, and this is in the record at A74, paragraph 85, it's not even clear who said this in terms of, you know, it must continue, you can't turn around the ship during the middle of the trip. It's either Hernandez or Garcia-Wrangell. It's not even clear from the complaint who we're talking about. So I think... But you, maybe I, you know, I went through this enough times, maybe I have it wrong. I thought the statement attributed to FE4, by Vargas at least, was that Garcia said the fraud was not sustainable. I don't need much context for that. No, but actually the allegation, and again, this is in the record at A74, it's that Vargas thought it was unsustainable and then had a conversation with either Mr. Hernandez or Garcia-Wrangell and they said you can't turn around the ship. All right, thank you. Thank you. Thank you. Mr. Goldberg, you have three minutes. There was a fact in Mohawk that the person responsible certified, that is nowhere in Mazzaro, it's nowhere in Omnicare, nowhere in MACA Rights, nowhere in Dynex. It doesn't exist. Certification isn't the issue. The issue is whether this person is furnishing or responsible for it. I want to talk a little bit about Wrangel-Sienter because you participated in the panel in the National Beverage case, Luke Sack versus National Beverage, and that's a non-precedential opinion, but it supports Mazzaro's means of assessing witnesses. Three witnesses appeared at a town hall meeting in April, three, all three. One says the whole meeting was called about fake sales. The other says it was called and we talked about pushing sales, and a third says, yeah, hey, Garcia-Wrangell was there, and he said keep doing what you're doing. It's for the good of the company. Now, I understand that the defendants have a perspective on those witnesses as did Judge Presnell, but Judge Grant in National Beverage, you called that type of credibility weighing improper. Let me repeat, improper. These witnesses are persons who if they testified, Judge Hinkle,  and then it would be for the finder of fact to assess whether they were at the meeting, whether there's corroboration, what do they believe. But you would acknowledge that our precedent allows us to take consideration of the fact that these are confidential sources. Yes, but we have the complaint, Judge Upbranch, sustains the Mazzaro National Beverage burden. It gives when these people were employed, it gives whom they reported to. In fact, one of them, it names. The vice president of human relations, of human resources, we named her. She's one of the witnesses. She's FE6. She participated in sales meetings weekly and heard Hernandez do what he did. Now, the other thing is FE4 was told, he asked Mr. Vera, please write instructions for me. Write instructions. And Vera said, I'm not writing instructions for you. Do it or make a decision, which FE4 said was after 17 years or 18 years with the company, I'm out. I'm not faking sales. That's what's going on here. And Rankhill Sienta, this complaint, pleads witnesses who are at a town hall meeting at which the subject matter itself was the fake scheme. Rankhill was there. He addressed the meeting. He said, keep going. I want to bring it back up out of the facts into the standard that I described to your friend on the other side. Setting aside whether you think that you could establish the standard, and maybe you think you do, do you think that that standard is an appropriate one? Could you refresh me? I'm so sorry. Sure. So the first one, I think we all agree, the individual agent who uttered or issued the misrepresentation. I think there's no question about that. And then the second would be any individual agent who authorized, requested, commanded, furnished information for, prepared, including suggesting or contributing language for inclusion therein or omission therefrom, reviewed or approved the statement in which the misrepresentation was made before its utterance or issuance. If this Court adopts omnicare, that's fine. I would prefer and suggest that what this Court in dictum stated in Mazzaro is the standard it ultimately adopts. And that is if you are, if somebody is responsible for, responsible for is important, you can do it by dictionary definition, you can do it by reference to precedent. And the reason for that. I think that, at least speaking only for myself, my concern is that we have said responsible for, and I think that is our standard and should be our standard and has to be our standard. But I have a hard time knowing what responsible for means. And those two statements from the Sixth Circuit are one answer. And I'm wondering if you think that that's a decent answer or if there's a better one. I think it's a decent answer. I think the better one, forgive me, the better one is leave it be. I cannot tell a jury responsible for, and when I get the first question, which I will, what does it mean to be responsible for, I can't tell the jury you figure it out. Well, actually, Judge Hinkle, you can. You can give them a standard by which they can, they can assess it. That's what Judge Grant is asking. So what's the standard? So proximate causation is the standard. How about a person who is the primary cause of? Forgive me, Judge Grant, I know you are struggling with whether dictionary definitions are helpful to determine what responsible for means. But if they are helpful in a statute, they certainly are helpful in trying to untangle what responsible for means. Can I get you to actually, this may sound basic, finish that sentence that says the person is responsible for, finish that sentence, responsible for what? The person is responsible for ultimately the falsity of the misstatement. Remember, in this case and in any Mazzaro case. This is where you're pulling in the scheme liability, the conduct. You have really pulled away, in my mind, I speak for no one else, away from the actual misstatements. And she's read a standard that's talking about people who are actually contributing to these misstatements. You're now suggesting with responsible for that you want to be responsible for the fraud. These two things, this is difficult. These two things, as the Supreme Court recognized, overlap. So let me see if I can simplify it. A scheme exists. It can have no impact for various reasons. See the Pew versus Tribune case. See Stone Ridge. A scheme exists. Now the question becomes how close to the misstatement is that scheme? Someone could have been liable for scheme liability in Pew, although the Seventh Circuit rejected it. But the scheme itself is responsible for the fraud, and therefore those acting with fraudulent intent, their scienter can be imputed to the corporation for purposes of both schemes. I think you're asking us ultimately with that approach to reverse Mazzaro because in that case we had the situation where the people were doing the rebates wrong, and we weren't imputing that to the company. But here you're saying, no, no, we actually need to. No, the reason you didn't in Mazzaro is the plaintiffs didn't plead it that way. The plaintiffs only pleaded the scienter of makers. So that's really just a malpractice case. That's not a case about the censor standards. If you believe I may, that question is not malpractice at all. They pleaded their complaint. They pleaded the scienter only in Home Depot of the makers, and therefore that's why in Mazzaro this court said in theory this could be. In theory there's corporate scienter. There's, forgive me, imputation, right? My friend says only the makers. Tupperware itself is a maker. It is a person under the express terms of the statute. Tupperware is a maker. But as we know, only its employees, agents, officers, directors have state of mind. The corporation doesn't. So then the question is whose state of mind can you impute? Home Depot is inapposite. Because the plaintiffs didn't plead as the plaintiff did in this case, that specific officers, not the makers, have acted with fraudulent intent and their intent and their conduct can be imputed to the corporation both for A and C liability and for the statements that Tupperware made under Section B. So I guess we are going to have to decide if this is in fact a scheme liability case or not. I think that it's a separate question, Judge. Yes, Judge Branch, it's a separate question. And Stonebridge doesn't control just because the scheme there was by people outside the company. And here it's a subsidiary, but you're just going to ignore that. Well, that is a factual distinction, but I think that Stonebridge helps you because you're asking what the standards should be. So at the one end, we've got a client and we've got a maker. And as Judge Branch said, we all understand that makers are their standards impute to the corporation. At the other end, in Stonebridge, we have a party on whom the Supreme Court's key language is no investor would rely. So now the question, Judge Hinkle, is in this band, where are we? Would investors in this case, and the standard is important, but this case is justiciable now. Would investors in this case have relied on Mr. Hernandez and Mr. Garcia-Rangel, and I submit to you that the entire context of this case is we've impaired, our stock price fell, we've got to do better, we are doing better, we're not at further risk of impairing, and then we did impair. And the reason they were able to avoid it was because of persons that the company said, these are the persons on whom you investors should rely. And therefore, as between Stonebridge, Judge Hinkle, and a maker, we're far closer to the maker. Okay, I think you have more than answered his question. Thank you all. We have your case under advisement. The court is in recess until tomorrow morning.